## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| **EVANTHIA KOTIS and AK,**<br>**parent and minor daughter,** | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **DOCKET NO:** |
| **v.** | : | |
| | : | |
| **ETHICON, INC.;** | : | |
| **ETHICON ENDO SURGERY, INC.;** | : | **COMPLAINT AND** |
| **ETHICON WOMEN'S HEALTH &** | : | **JURY DEMAND** |
| **UROLOGY (A DIVISION OF** | : | |
| **ETHICON, INC.);** | : | |
| **JOHNSON & JOHNSON** | : | |
| **SERVICES, INC.;** | : | |
| **JOHNSON & JOHNSON,** | : | |
| | : | |
| **Defendants.** | : | |

Plaintiffs Evanthia Kotis ("Plaintiff") and AK ("minor-Plaintiff"), by their attorneys, Pogust Braslow & Millrood LLC, complaining of the defendants, respectfully allege, upon information and belief, as follows:

## I.   INTRODUCTION

1.      This action is a products liability action against Defendants Ethicon, Inc., Ethicon Women's Health & Urology Division of Ethicon, Inc., and Ethicon Endo-Surgery, Inc. (together "Ethicon") as well as Johnson & Johnson and Johnson & Johnson Services, Inc. (together "Johnson & Johnson"), resulting from the use of said defendants' morcellator surgical products, specifically the Ethicon Gynecare Morcellex Tissue Morcellator.

2.      On November 17, 2010, Dr. Ely Brand performed a total robotic hysterectomy and bilateral salpingo-oophorectomy on Plaintiff Evanthia Kotis at Memorial Hospital West in Pembroke Pines, Florida for suspected uterine fibroids and degeneration.   During the

hysterectomy, an Ethicon Gynecare Morcellex Tissue Morcellator was used to remove portions of the uterus.

3.     At some point during the morcellation, Dr. Brand noticed the presence of an unusual color in the morcellated uterine tissue.   At that time, Dr. Brand discontinued morcellation and sent specimens of the morcellated uterus to the pathologist, at which time it was determined that Plaintiff had previously unknown and undiagnosed leiomyosarcoma.   At that time, the pathologist determined that the margins were clean and there had not been any metastasis to the lymph nodes, as all 25 nodes tested were negative.   Nevertheless, the doctors could not account for the fact that the power morcellation may have disseminated cancerous cells and tissue from the leiomyosarcoma into Plaintiff's abdomino-pelvic region.

4.     Not even two years later in March 2012, during one of the regularly scheduled follow-up CT scans, Plaintiff's leiomyosarcoma was found to have metastasized to her naval.   In August 2012, it was found to have also metastasized to her ribcage, spleen, and pelvis.   At that time, Plaintiff was diagnosed with Stage IV (terminal) leiomyosarcoma.

## II.     JURISDICTION AND VENUE

5.     This Court has original jurisdiction pursuant to 28 U.S.C. §1332, as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states as plaintiffs are residents and citizens of the state of Florida and defendants are residents of the States of New Jersey and Ohio.

6.     Venue in the Southern District of Florida is proper under 28 U.S.C. §1391(b) (2) as a substantial part of the events or omissions giving rise to the claim occurred in this District, including but not limited to Plaintiff's treatment and the surgery itself.

## III.     PARTIES

7.    Plaintiff Evanthia Kotis is an adult individual who at all times relevant to this action was a resident and citizen of the state of Florida, living in the city of Pembroke Pines.

8.    Minor-Plaintiff AK is a minor individual, currently twelve (12) years old, who at all times relevant to this action was a resident and citizen of the state of Florida, living in the city of Pembroke Pines with her mother.

9.    Defendant ETHICON, INC. is a corporation organized and/or existing under the laws of the State of New Jersey, with its principal place of business at 737 U.S. Highway 22, Bridgewater, New Jersey 08807.

10.    Defendant ETHICON ENDO-SURGERY, INC. is a corporation organized and/or existing under the laws of the State of Ohio, with its principal place of business at 4545 Creek Road, Blue Ash, Ohio 45242.

11.    Defendant ETHICON WOMEN'S HEALTH & UROLOGY DIVISION OF ETHICON, INC. is a corporate division of ETHICON, INC. organized and/or existing under the laws of the State of New Jersey, with its principal place of business at Route 22 West Somerville, New Jersey 08876.

12.    Defendant JOHNSON & JOHNSON SERVICES, INC. is a corporation organized and/or existing under the laws of the State of New Jersey, with its principal place of business at I Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

13.    Defendant JOHNSON & JOHNSON is a corporation organized and/or existing under the laws of the State of New Jersey, with its principal place of business at 1 Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

14.    On information and belief, Defendant JOHNSON & JOHNSON owns all of the common stock and other ownership interests of Defendants ETHICON, INC., ETHICON

WOMEN'S HEALTH & UROLOGY DIVISION OF ETHICON, INC., ETHICON ENDO-SURGERY, INC., and JOHNSON & JOHNSON SERVICES, INC.

15.     On information and belief, JOHNSON & JOHNSON is either the direct  or indirect owner of substantially all the stock or other ownership interests of ETHICON, INC., ETHICON WOMEN'S HEALTH & UROLOGY DIVISION OF ETHICON, INC., ETHICON ENDO-SURGERY, INC., and JOHNSON & JOHNSON SERVICES.

16.     On information and belief, JOHNSON & JOHNSON, ETHICON, INC., ETHICON WOMEN'S HEALTH & UROLOGY DIVISION OF ETHICON, INC., ETHICON ENDO-SURGERY, INC., and JOHNSON & JOHNSON SERVICES were the agents, representatives, joint venturers, alter egos, co-conspirators, consultants, predecessors, successors, servants or employees of each other.

17.     In doing the acts alleged herein, said Defendants were acting in the course and scope of such agency, representation, joint venture, conspiracy, consultancy, predecessor agreement, successor agreement, service and employment, with knowledge, acquiescence and ratification of each other (hereinafter JOHNSON & JOHNSON, ETHICON, INC., ETHICON WOMEN'S HEALTH & UROLOGY DIVISION OF ETHICON, INC., ETHICON ENDO-SURGERY, INC., and JOHNSON & JOHNSON SERVICES are collectively referred to as "JOHNSON & JOHNSON").

18.     On information and belief, at all relevant times, Defendants expected or should have expected that their acts would have consequences within the United States of America and the State of Florida, and derived and derive substantial revenue from interstate commerce.

19.     On information and belief, at all relevant times, Defendants have transacted and conducted business in the State of Florida, and/or contracted to supply goods and services within

4

the State of Florida, and these causes of action have arisen from same.

20.    On information and belief, at all relevant times, Defendants committed tortious acts without the State of Florida causing injury within the State of Florida out of which act(s) these causes of action arise.

## IV.    DISCOVERY RULE, TOLLING AND FRAUDULENT CONCEALMENT

21.    Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint with the same force and effect as if fully set forth herein.

22.    Plaintiffs assert all applicable state statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including discovery rule, fraudulent concealment, and/or joint and inseparable toning.

23.    Plaintiffs submit that the discovery rule should be applied to toll the running of the statute of limitations until the Plaintiffs knew, or through the exercise of reasonable care and diligence should have known, of facts indicating that Plaintiffs had been actually injured, or the tortious nature of the conduct causing these injuries.

24.    Plaintiffs did not suspect, nor did they have reason to suspect, that they had been injured, or the tortious nature of the conduct causing these injuries, until less than the applicable limitations period prior to the filing of this action.

25.    Despite diligent follow-up by Plaintiff, including regular consultations with Plaintiff's medical providers, including but not limited to CT scans every three (3) months following her hysterectomy, the nature of Plaintiff's injuries and damages, specifically the metastasis of her leiomyosarcoma due to Defendant's morcellator was not discovered until March 2012.

26.    Prior to March 2012, Plaintiff had no way of knowing or discovering that her

leiomyosarcoma had metastasized and that Defendant's morcellator had in fact spread and disseminated her previously undetected and undiagnosed leiomyosarcoma.

27.   Therefore, under the appropriate application of the discovery rule, Plaintiffs' suit was filed well within the applicable statutory limitations period.

28.   Defendants are estopped from asserting a statute of limitations defense because all Defendants fraudulently misrepresented, omitted and concealed from Plaintiffs and Plaintiff's physician the dangers of using a power morcellator during her hysterectomy.

## V.   BACKGROUND AND FACTS

### A.   Plaintiff's Surgery and the Resultant Spread of Life-threatening Cancer

29.   Plaintiff Evanthia Kotis is, and at all times relevant was, a mother and sole caretaker for minor-Plaintiff, who is presently twelve (12) years old and is and has been living with her mother and under her mother's supervision and care at all times relevant.

30.   On November 17, 2010, Plaintiff underwent a surgical procedure known as a Robot-assisted hysterectomy with uterine morcellation at the Memorial Hospital West of Pembroke Pines, Florida.

31.   On November 17, 2010, Plaintiff's hysterectomy was performed by Dr. Ely Brand of Memorial Hospital West in Pembroke Pines, Florida.

32.   Prior to the Plaintiff's surgery on November 17, 2010, there was no known evidence of cancer and certainly no evidence of metastatic cancer/disease. Indeed, prior to her surgery, Plaintiff underwent testing and evaluation which showed no evidence of cancer.

33.   Prior to undergoing surgery, Plaintiff was not warned of the danger and likelihood that use of a laparoscopic power morcellator could disseminate and upstage occult cancer. In fact, Plaintiff was specifically concerned about having a laparoscopic hysterectomy, and was

assured by her surgeon that there were *less* risks involved with the laparoscopic surgery with power morcellation.

34.    During the laparoscopic hysterectomy, Dr. Ely Brand used an Ethicon Gynecare Morcellex Tissue Morcellator to assist in the removal of Plaintiff's uterus.

35.    At some point during the morcellation, Dr. Brand noticed the presence of an unusual color in the morcellated uterine tissue being collected.   At that time, Dr. Brand discontinued morcellation.

36.    Dr. Brand sent specimens of the uterine tissue to pathology, at which point it was determined that the tissue was suspicious for leiomyosarcoma.   That suspicion was later confirmed with further testing.

37.    Following the procedure, it was determined that Plaintiff did in fact have previously unknown and undiagnosed leiomyosarcoma, however, 25 regional lymph nodes revealed no metastasis and the margins were clear.

38.    Despite these test results, and in abundance of caution, Plaintiff started on chemotherapy in or around January 2011.

39.    By March 2012, less than two years after Plaintiff's laparoscopic hysterectomy with the power morcellator, it was found that Plaintiff's leiomyosarcoma had metastasized to her naval.  At that time, she was diagnosed with metastatic leiomyosarcoma.

40.    In June 2012, Plaintiff underwent surgery to remove the tumor on her naval.

41.    In August 2012, it was found that Plaintiff's leiomyosarcoma had also metastasized to her ribcage, spleen, and pelvis.  At that time, she was diagnosed with Stage IV (terminal) metastatic leiomyosarcoma.

42.    Plaintiff has continued with chemotherapy treatment and radiation therapy since

January 2011, which has now been over four (4) years. Her treatments have been even more aggressive since March 2012 when she learned of the metastasis. She is presently on her third type of chemotherapy, and much like her previous treatments, she is currently on a twelve (12) week course of treatment that includes alternating between two weeks on chemotherapy and one week off.

43.     Each and every Defendant herein failed to warn Plaintiff or her physician about the possibility of dissemination of an occult uterine leiomyosarcoma throughout the peritoneal cavity.

44.     Defendants were each aware of the risks, complications, and/or adverse events associated with their products used for uterine morcellation.

56.     Had the laparoscopic power morcellator used on Plaintiff not released and disseminated cancerous cells and tissue, she would not have been diagnosed with an advanced metastatic Stage IV cancer and/or would not have suffered and been diagnosed with a recurrence of leiomyosarcoma.

57.     The laparoscopic power morcellator used on Plaintiff during her November 17, 2010 surgery caused Plaintiff's current cancerous condition, and it has profoundly and gravely injured Plaintiff.

58.     As a result of the conduct alleged herein by Defendants, Plaintiff suffered serious bodily injury and is likely to die from her condition. In addition to the medical bills that Plaintiff has and will continue to incur, she will also continue to suffer severe physical and mental pain as a result of her terminal condition.

B.     <u>Background on Laparoscopic Power Morcellators</u>

59.     In the United States, it is estimated that 650,000 women a year will undergo a

surgical myomectomy or hysterectomy for the management of symptomatic uterine fibroids.

60.      In conventional non-Power Morcellator hysterectomies, the women's entire uterus is removed essentially intact and in conventional myomectomies the uterine fibroids are removed essentially intact and the women's uterus is left intact.

61.      In the last few decades, laparoscopic procedures with electric Laparoscopic Power Morcellator devices to remove uterine fibroids or other tissue, have increasingly replaced traditional open abdominal surgical hysterectomies, myomectomies, and laparotomies.

62.      Laparoscopic Power Morcellators are electrically powered medical tools with spinning blades that shred, grind, and core tissue into smaller pieces or fragments so the tissue can be removed through small incisions or extraction "ports" in the abdomen.

63.      Laparoscopic Power Morcellators are designed with a grasper that pulls the tissue up against the sharp, rotating blades, severing the shredded tissue from the rest of the large mass and continuously pulling cut portions of tissue up through the tube.

64.      The morcellator's spinning blade shreds the tissue masses at a high velocity and can disperse cellular particles from the shredded tissue throughout the abdomen during surgery.

65.      During tissue morcellation, morcellated fragments can be left in the abdomino-pelvic cavity, or attach to surrounding organs (such as the loops of the bowel), and cancerous cells can travel to remote areas of the body through the vasculature or lymphatic system.

66.      Once disseminated in the body, morcellated fragments can become implanted in surrounding tissue or organs, and begin to grow.

67.      When tissue fragments escape into the abdomino-pelvic cavity and seed in other tissue or organs, complications can arise months or years after the surgery.

68.      As a result, use of a Laparoscopic Power Morcellator can spread and upstage or

worsen a women's occult cancer, changing the stage of the cancer from an early stage cancer into a much higher stage cancer and, as discussed below, significantly worsening a women's prognosis.

69.     Defendants were responsible for designing, researching, developing, testing, manufacturing, packaging, labeling, marketing, promoting, distributing and/or selling Laparoscopic Power Morcellators under the following trade names: the Gynecare Morcellex Tissue Morcellator, the Morcellex Sigma Tissue Morcellator System, and the Gynecare X-tract Tissue Morcellator.

**C.      The Laparoscopic Power Morcellator Used In Plaintiff's Surgery Was Defective In Design And Created An Avoidable Risk Of Harm To Plaintiff, Which Significantly Worsened Her Chance Of Survival**

70.     Long before Plaintiff underwent surgery in November 2010, Defendants knew or should have known that their Laparoscopic Power Morcellators could cause occult malignant tissue fragments to be disseminated and implanted in the body, which, in turn, upstages any cancer present and significantly worsens a woman's chance of survival.

71.     Although evidence was available to Defendants for years before Plaintiff's surgery, Defendants failed to respond to multiple published studies and reports describing the risk of disseminated and upstaging or worsening occult cancer with Laparoscopic Power Morcellator use, and failed to design their Laparoscopic Power Morcellators, including the Gynecare Morcellex Tissue Morcellator, in a manner to reduce this life-threatening risk.

72.     On information and belief, Defendants, as is industry practice, daily monitor the medical and lay media for articles on issues concerning their products, Laparoscopic Power Morcellators.

73.     On information and belief, many, if not all, of the literature cited below was

collected by and known to the Defendants (or should have been known to the Defendants) at or before the time the literature was published.

74.     *First,* Defendants knew or should have known that their Laparoscopic Power Morcellators could cause occult malignant tissue fragments to be disseminated and implanted in the body.

a.     Indeed, on August 6, 1991, a patent for a Surgical Tissue Bag and Method for Percutaneously Debulking Tissue was issued that describes the potential for Laparoscopic Power Morcellators to disseminate and implant malignant tissue fragments in the body.

b.     The patent for the surgical tissue bag stated:

> Another problem associated with the debulking, removal or morcellation of large tissue volume is the concern for containing malignant or pathogenic tissue. *The morbidity of patients significantly increases when malignant cells of such large volume tissue are permitted to come in contact with surrounding healthy tissue.* A malignancy would typically indicate a more invasive procedure in which the cavity is opened and the affected tissue is removed. These invasive open cavity procedures increase the recovery period of the patient and subject the patient to additional discomfort and complications.
> As a result, *the debulking of large malignant tissue volumes percutaneously through an access sheath presents significant morbidity risks to the patient.* (emphasis added).

c.     The patent Summary of the invention further stated that "containment of the tissue within the bag also prevents the spread of malignant cells to healthy tissue in the body cavity."

d.     The Surgical Tissue Bag patent was publically available and was available to the Defendants, and/or known to Defendants, before they first sought approval of their Laparoscopic Power Morcellators.

e.     Also, prominent medical journals reporting on Laparoscopic Power Morcellators

11

and the risk of spreading undetected cancer also began to accumulate in the 1990s, and continued thereafter.

f.  In 1997, Schneider published a case report in a medical journal, known to the Defendants as *The American Journal of Obstetrics & Gynecology*, titled "Recurrence of unclassifiable uterine cancer after modified laparoscopic hysterectomy with morcellation," which reported a patient who underwent a laparoscopic supracervical hysterectomy by manual morcellation. Schneider, Recurrence of unclassifiable uterine cancer after modified laparoscopic hysterectomy with morcellation, J. AM. OBSTET. GYNECOL., 177(1):478-9 (1997).

g.  The following year the patient died due to the rapid progression of uterine adenocarcinoma that had been undetected prior to surgery. *Id.* at 478.

h.  Schneider cautioned that evaluation for malignancy prior to surgery "grows even more important and should be mandatory when uteri are increasingly morcellated by introduction of laparoscopic techniques." *Id* at 479.

i.  In 1998, Hutchins and Reinoehl published a case report in *The Journal of the American Association of Gynecologic Laparoscopists*, which was known to the Defendants, in which the authors explained that "[b]ecause of the large quantity of tissue of such a uterus, it would be anticipated that numerous fragments would be generated during morcellation." Hutchins and Reinoehl, Retained Myoma after Laparoscopic Supracervical Hysterectomy with Morcellation, J. AM. Assoc. GYNECOL. LAPAROSC., 5(3):293-295 (1998).

j.  The authors cautioned that the morcellated fragments could become concealed in

surrounding organs making it difficult for the surgeon to identify and remove all tissue fragments. *Id.* at 294.

k.   In 2005, LaCoursiere et al. published a case report in *The Journal of Minimally Invasive Gynecology* which reported that "[t]he use of a power morcellator may produce smaller fragments than other techniques." LaCoursiere et al., Retained fragments after total laparoscopic hysterectomy, J. MINIM. INVAS. GYNCOL., 12:67-69, 68 (2005)

l.   According to the authors, "implantation, rather than resorption of residual fragments of cervix and myometrium can occur," a problem which they reported "ha[d] implications for possible benign and malignant sequelae." *Id.*

m.   In 2010, in *The Journal of Minimally Invasive Gynecology*, Larrain et al. explained that, "[i]f retained fragments [from morcellation] can establish a blood supply and grow with benign disease, it is of concern that in situations in which an unsuspected malignant lesion is inadvertently morcellated, aberrant fragments will grow and metastasize." Larrain et al., "Iatrogenic" Parasitic Myomas: Unusual Late Complications of Laparoscopic Morcellation Procedures, MINIM. INVAS. GYNCOL., 17:719-724, 722 (2010) ("Larrain et al. paper").

n.   Based on this evidence, Defendants were on notice that their Laparoscopic Power Morcellators exposed patients to a significant risk of disseminating and worsening occult cancer.

84.   *Second,* Defendants knew or should have known that, for women undergoing laparoscopic hysterectomies or myomectomies for presumed fibroids, the risk of having a hidden

deadly sarcoma was much higher than 1 in 10,000.

a.  In 1990, Leibsohn et al. published a study titled "Leiomyosarcoma in a series of hysterectomies performed for presumed uterine leiomyomas" in *The American Journal of Obstetrics & Gynecology* in which the authors found that "...women with signs and symptoms of [benign] uterine leiomyomas [fibroids] that warrant hysterectomy have about a <u>1 in 140</u> **chance** of having a uterine leiomyosarcoma." Leibsohn et al., Leiomyosarcoma in a series of hysterectomies performed for presumed uterine leiomyomas, Am. J. Obstet. Gynecol. 162:968-76, 972 (1990) ("Leibsohn et al. paper") (emphasis added).

b.  In 1999, Takamizawa et al. published another study titled "Risk of Complications and Uterine Malignancies in Women Undergoing Hysterectomy for Presumed Benign Leiomyomas" in *Gynecologic and Obstetric Investigation*, which found that <u>2</u>/923 women who underwent hysterectomies for presumed benign fibroids had undiagnosable hidden sarcomas before their hysterectomies. Takamizawa et al., Risk of Complications and Uterine Malignancies in Women Undergoing Hysterectomy for Presumed Benign Leiomyomas, GYNECOL. OBSTET. INVEST., 48:193-196, 196 (1999).

c.  Takamizawa et al. reported that their study results were consistent with the findings of other studies which suggested that 2-5 patients per 1,000 who undergo surgery for presumed fibroids have uterine sarcomas. *Id.*

d.  This evidence was available to Defendants.

e.  However, on information and belief, in seeking for approval for their Laparoscopic Power Morcellators decades before Plaintiff underwent surgery,

and, later, in promoting their devices to the medical community, Plaintiff and her surgeon, Defendants ignored this data and touted a much lower 1 in 10,000 risk.

85.     *Third,* Defendants knew or should have known that women could not be adequately screened for malignancy prior to undergoing Laparoscopic Power Morcellation surgery because certain types of cancers, including sarcomas, can mimic the radiographic appearance of benign uterine fibroids.

a.      In the 1990 Leibsohn *et al.* study, discussed *supra,* the authors described the difficulties in diagnosing leiomyosarcoma (a particularly aggressive form of cancer) preoperatively, noting that "abdominal ultrasonography of the pelvis and cervical cytology are not helpful preoperative tests for the diagnosis Lot] leiomyosarcoma of the uterus." *See* Leibsohn *et al.* paper, at 192.

b.      Additional evidence became available to Defendants in 2001, when Stewart published an article in *The Lancet*, which explained that malignant leiomyosarcoma and benign fibroids may share histological features; thereby, making it more difficult for clinicians to identify the malignant potential of smooth muscle uterine tumors. Stewart, Uterine Fibroids, THE LANCET, 357:293- 98 (2001).

c.      The difficulty in diagnosing uterine sarcoma preoperatively was not limited to leiomyosarcoma.

d.      On information and belief, in 2006, Robert Lamparter, M.D., a pathologist at Evangelical Community Hospital in Lewisburg, Pennsylvania, wrote to  the former medical director of Ethicon Women's Health and Urology, a JOHNSON AND JOHNSON subsidiary, imploring the company to "reconsider the risk [of

power morcellators] to the patient."

   •    *See* http://www.bizjournals.com/pittsburgh/news/2014/05/30/j-j-alerted-in-2006-to-devices-surgical-risks.html (last checked 3/19/2015).

e.    Dr. Lamparter advised Ethicon that, "[v]irtually all uteruses have some sort of pre-op screening, whether it be an endometrial biopsy or an ultrasound, so whatever screening is being done misses a certain number of malignancies." *Id.*

f.    However, "[w]hen the operative procedure is a standard hysterectomy, no damage is done. If a morcellation is done, the patient's survival is jeopardized." *Id.*

g.    In 2008, Bansal et al. published a study in GYNECOLOGIC ONCOLOGY, in which the authors found that the predictive value of endometrial biopsy or curettage for diagnosing uterine sarcoma was very poor and, thus, "novel diagnostic techniques are needed to accurately identify uterine sarcomas preoperatively." Bansal et al., The utility of preoperative endometrial sampling for the detection of uterine sarcoma, GNECOL. ONCOL., 110:43-48, 47 (2008).

h.    Similarly, in 2010, Della Badia and Karini published a case report in *The Journal of Minimally Invasive Gynecology*, in which they warned that there was "no reliable method for preoperative diagnosis of endometrial sarcoma" and "[s]ensitivity of preoperative endometrial sampling is only 64% for enabling a diagnosis of this tumor." Della Badia and Kari-.ii, Endometrial Stromal Sarcoma Diagnosed after Uterine Morcellation m Laparoscopic Supracervical Hysterectomy, J. MINIM. INVAS. GYNCOL., 17:791-93, 791 (2010).

i.    According to the authors, where malignancy is found before surgery, the standard

treatment for uterine sarcoma is a total hysterectomy with staging of the cancer, not tissue morcellation. *Id.*

86.     *Fourth,* Defendants knew or should have known that women undergoing surgery with Laparoscopic Power Morcellators suffer worse long-term medical outcomes than women undergoing other available treatment options because of the cancer risks associated with the use of their devices.

    a.     For example, in 2002, Goto et al. published a study in the *International Journal of Gynecologic Cancer*, which reported:

> Leiomyosarcoma of the uterus is one of the most difficult neoplasms to cure in gynecologic oncology. Its malignant behaviors such *as* rapid growth and high rate of metastasis are notorious. *The 5-year survival in patients with advanced stages (stage III or higher) is less than 10%,* although leiomyosarcoma resembles leiomyoma in clinical features. Until now LMS was diagnosed only in advanced stages or accidentally at total abdominal hysterectomy.
>
> [...]
>
> Therefore it seems that the effective treatment of LMS is surgical removal of the tumor in the earlier stages. The problem regarding treatment of LMS is the difficult preoperative differential diagnosis of LMS in the early stages from leiomyoma, which is the most common tumor of the uterus.

Goto. et al., Usefulness of Gd-DTPA contrast-enhanced dynamic MRI and serum determination of LDH and its isozymes in the differential diagnosis of leiomyosarcoma from degenerated leiomyoma of the uterus, INT. J. GYNECOL. CANCER, 12:354-361, 358 (2002) (emphasis added).

    b.     Likewise, in 2003, Morice et al. published an article in the EUROPEAN JOURNAL OF GYNECOLOGIC ONCOLOGY, in which they found a substantial increase in pelvic recurrence of uterine sarcoma at three (3) months in 34 patients with uterine sarcoma who had morcellation during their initial

surgery compared with 89 patients without morcellation. Morice et al., *Prognostic value of initial surgical procedure for patients with uterine sarcoma: analysis of 123 patients*, EUR. J. GYNAECOL. ONCOL., 24(3-4);237-40, 238-39 (2003).

c.      The authors concluded that, when the diagnosis of uterine sarcoma is known preoperatively, the optimal treatment for uterine sarcoma is a "monobloc" total abdominal hysterectomy and bilateral salpingo-oophorectomy without morcellation. *Id.* at 239.

d.      In 2008, Einstein et al. presented a prospective study in the *International Journal of Gynecologic Cancer* involving all patients who had undergone any type of hysterectomy for presumed benign disease and were, subsequently, referred to Memorial Sloan-Kettering between January, 2000 and March, 2006 with diagnosed malignancy based on the final surgical pathology. Einstein et al., *Management of uterine malignancy found incidentally after supracervical hysterectomy or uterine morcellation for presumed benign disease*, INT. J. GYNECOL. CANCER, 18: 1065-70, 1066 (2008).

e.      According to their review, an astounding 40% percent of patients who underwent morcellation were found to have upstaged cancer compared with only 8% who had a supracervical hysterectomy. *Id.* at 1069.

f.      According to the authors, *"[this] data support this trend toward worse outcomes in patients who had morcellationprocedures." Id*

g.      In 2009, Perri et al. published an article in the *International Journal of Gynecologic Cancer*, in which they explained:

        [u]nfortunately, however, it is not unusual to diagnose LMS

18

> [leiomyosarcoma] only postoperatively because its symptoms and signs resemble those of benign leiomyomas (LMs), and there are no imaging techniques for differentiation between the two. Consequently, on the assumption that they have LM, some patients with LMS are treated initially with hysteroscopic or abdominal myomectomy, subtotal hysterectomy, or laparoscopic hysterectomy or myomectomy with a morcellator knife. Those surgical techniques, unlike total abdominal hysterectomy (TAH), are likely to involve tumor injury or cut-through.

Perri et al., Uterine Leiomyosarcoma: Does the Primary Surgical Procedure Matter?, INT. J. GYNECOL. CANCER, 19(2): 257-260, 257 (2009).

h. According to the authors, "[their] data demonstrated a significant disadvantage for patients in whom the primary surgery had involved tumor cut-through." *Id.* at 260.

i. In the 2010 Larrain et al. study, discussed supra, *they* commented that "[i]f malignancy is suspected or known preoperatively, morcellation is formally proscribed. However, this situation [spread of malignant tissue] may occur, even if an appropriate preoperative workup including cervical cytologic analysis and endometrial sample are routinely performed." Larrain et al. paper at 722-23.

j. Consistent with Perri et al.'s findings, in a paper published in 2011 in *The Annals of Surgical Oncology*, Park et al. found that women undergoing morcellation suffered worse outcome than women in the non-morcellated treatment group. Park et al., The Impact of Tumor Morcellation During Surgery on the Outcomes of Patients with apparently Early Low-Grade Endometrial Stromal Sarcoma of the Uterus, Ann. Surg. Oncol., 18:3452-61 (2011) ("Park et al. paper")

k. The authors compared outcomes between patients diagnosed post-operatively with low-grade endometrial stromal sarcoma who had undergone tumor morcellation and those who had not. *Id.* at 3454.

l.      They found a statistically significant difference in five-year disease-free survival rates between non-morcellated patients (85%) and morcellation patients (55%). *Id.* at 3455.

m.      In the 2011 Park et al. paper, the authors also found that five-year abdomino-pelvic disease-free survival was statistically significantly lower in morcellated patients, with 89% disease-free survival rate in the non-morcellated patients and only 58% in the morcellated group. *Id.* at 3456.

n.      The authors noted that "[a]s with other soft tissue sarcomas, iatrogenic rupture and intraperitoneal spillage of tumor may adversely affect the outcomes of patients with apparently early LGESS [low-grade endometrial stromal sarcoma], for whom complete surgical excision is the only established curative treatment modality." *Id.* at 3457.

87.      *Fifth,* Defendants knew or should have known that when malignant tissue undergoes Laparoscopic Power Morcellation, the resultant tissue specimens can delay diagnosis because their condition can prevent the pathologist from properly identifying and staging cancer, which can further worsen a patient's prognosis and treatment outcomes.

a.      For example, in 2005, Rekha et al. discuss in their paper published in the AUSTRALIAN AND NEW ZEALAND JOURNAL OF OBSTETRICS AND GYNECOLOGY, "[o]ne of the disadvantages of tissue morcellation is loss of the gross appearance of the specimen and the possibility of missing the most suspicious area for the microscopic evaluation." Rekha et al., Unexpected complications of uterine myoma morcellation, Aust. N.Z. J. Obstet. Gynecol., 45: 248-49, 248 (2005).

b.      Rekha et al.'s case report involved a 40-year-old woman who underwent total laparoscopic hysterectomy for presumed benign uterine fibroids died several months after her initial surgery from dissemination of occult leiomyosarcoma. *Id.*

c.      According to the authors, the patient's "malignant component was missed at the time of initial histological evaluation due to evaluation of limited tissue." *id*

d.      Published in 2011, Hagemann et al. also discuss the difficulty of analyzing morcellated specimens in their case series "Risk of Occult Malignancy in Morcellated Hysterectomy: A Case Series" that appeared in the INTERNATIONAL JOURNAL OF GYNECOLOGICAL PATHOLOGY. Hagemann et al., Risk of Occult Malignancy in Morcellated Hysterectomy: A Case Series, INT. J. GYNECOL. CANCER, 30:478-83 (2011).

e.      In their article, Hagemann et al. explained that "[t]hese [morcellated] specimens are examined in the surgical pathology laboratory where, by their fragmented and unoriented nature, they present a special challenge to the pathologist. There is little evidence to guide the pathologic examination of these specimens." *Id* at 481-82.

88.     As set forth herein, over the years numerous journal articles and published studies have examined Laparoscopic Power Morcellators' potential to spread and worsen a women's occult cancer.

89.     This evidence should have placed Defendants on notice that their Laparoscopic Power Morcellators were associated with and/or could cause the dissemination and upstaging or worsening of a women's occult cancer.

90.     Yet, as designed and marketed, the Laparoscopic Power Morcellator used on

21

Plaintiff during her 2010 surgery was unsafe for its intended purpose and defective in design in that it subjected the Plaintiff to the avoidable risks of harm, including, *inter alia:* (a) dissemination and implantation of occult malignant or cancerous tissue; (b) increasing Plaintiff's probability to develop metastatic cancer; (c) upstaging or worsening a patient's occult malignancy; (d) causing earlier recurrence of cancer; and (e) significantly lowering the Plaintiff's likelihood of long-term survival.

91.     Knowing their Laparoscopic Power Morcellators had the potential to spread and upstage or worsen a woman's occult cancer, Defendants should have designed, marketed and sold their Laparoscopic Power Morcellators, including the Defendants' Gynecare Morcellex Tissue Morcellator, with a containment bag or system specifically designed to minimize or prevent the risk of disseminating cancerous tissue.

92.     On information and belief, said containment bag or system should have been designed to accommodate and withstand the morcellator blade and the large tissues that are often encountered in gynecologic surgery.

93.     Defendants' failure to design, develop, manufacture, market and sell the Laparoscopic Power Morcellator used in Plaintiff's surgery with a containment bag or system to minimize or prevent the risk of disseminating cancerous tissue was negligent and fell below the standard of care expected of a reasonable medical device manufacturer.

94.     Additionally, at the time of Plaintiff's surgery, numerous other treatment options for fibroids were available, which had more established safety profiles and considerably lower risk profiles than Laparoscopic Power Morcellators including, but not limited to, total abdominal hysterectomies ("TAH"), minimally-invasive hysterectomies and myomectomies, including those using manual morcellation, and embolization and ablation treatments.

22

95.     Accordingly, for this and the other reasons set forth here and below, the Laparoscopic Power Morcellator used in Plaintiff's surgery was defective in design.

96.     As set forth here and below, the defective design of the Laparoscopic Power Morcellator used on Plaintiff during her 2010 surgery, was the proximate cause of Plaintiff's injuries.

### D.     The Laparoscopic Power Morcellator Used In Plaintiff's Surgery Contained An Inadequate Warning

97.     The Defendants failed to provide a reasonable sufficient or adequate warning about the true risks of disseminating and upstaging occult cancer from the use of their Laparoscopic Power Morcellators, including the Defendants' Gynecare Morcellex Tissue Morcellator.

98.     In 1995, the first Power Morcellator reached the market with an indication for gynecologic laparoscopic procedures based on literature involving the device's use in merely 11 patients.

99.     Power Morcellators are Class II medical devices.

100.     Class II devices are regulated by the Food and Drug Administration Center for Medical Devices and Radiological Health.

101.     Such devices are required to undergo a "510(k)" process prior to being distributed, which simply requires the manufacturer to notify the FDA under section 510(k) of the Medical Device Amendments to the Food, Drug, and Cosmetics Act of 1938 ("MDA"), of its intent to market a device at least ninety (90) days prior to the device's introduction on the market, and to explain the device's "substantial equivalence" to a pre-MDA predicate device.

102.     Each time the Defendants sought to market a new Laparoscopic Power Morcellator device they did so without submitting premarket approval-testing (required under

FDA regulations for Class III devices) and merely based on the Defendants' assertions that the subject device was "substantially similar" to another legally marketed device.

103.    Based on the Defendants' assertions that their device was "substantially similar" to a marketed device, the FDA cleared the device for sale in the United States.

104.    FDA approval or clearance actions do not guarantee that a product will be found to be compliant or safe and effective for its intended uses for all times and for all purposes.

105.    After the FDA cleared the Laparoscopic Power Morcellator used in Plaintiff's surgery for sale in the U.S., the Defendants were under an obligation to ensure the quality and safety of their marketed product.

106.    Defendants have an ongoing duty of medical device surveillance and vigilance and were under a continuing duty to inform surgeons, regulatory agencies, and the public of new safety and efficacy information they learn, or should have learned, about their marketed devices once that information becomes available to Defendants.

107.    According to the FDA guidance to medical device manufactures, an appropriate Warning should be included if there is reasonable evidence of an association of a serious hazard with the use of the device. A causal relationship need not have been proved. *See* Device Labeling Guidance #091-1 - blue book memo, March 8, 1991.

108.    However, Defendants ignored mounting evidence about the cancer risk, and exposed Plaintiff to an avoidable risk of harm by failing to disclose:

   a.    The difficulty of effectively diagnosing cancer prior to (or during) surgery with available diagnostic tools;

   b.    The actual prevalence of undiagnosed uterine sarcomas in women undergoing morcellation;

c.    The actual rates at which Laparoscopic Power Morcellators disseminated and/or upstaged occult cancer;

d.    Laparoscopic Power Morcellators are associated with worse long-term medical outcomes than other fibroid treatments because of the risk of occult cancer being spread and implanted by the use of the device; and

e.    If cancer is discovered after morcellation, staging and pathological diagnosis could be impeded, thus yielding worse prognosis and outcomes for the patient, including Plaintiff.

109.    On information and belief, at the time of Plaintiff's 2010 surgery, the Defendants' instructions for use that accompanied their Laparoscopic Power Morcellators, including the Gynecare Morcellex Tissue Morcellator, contained a "CAUTION" which merely provided: "[a] tissue extraction bag is recommended for the morcellation of malignant tissue or tissue suspected of being malignant and for tissue that the physician considers to be potentially harmful when disseminated in a body cavity."

110.    The device used on Plaintiff, the Gynecare Morcellex Tissue Morcellator, however, failed to contain a Warning or an adequate warning regarding the potential of the Laparoscopic Power Morcellator to spread occult cancer.

111.    Likewise, the Laparoscopic Power Morcellator used on Plaintiff, the Gynecare Morcellex Tissue Morcellator, failed to contain a recommendation to use a tissue extraction bag to minimize the risk of spreading occult cancer.

112.    Defendants' statements were insufficient and negligent in that they wrongly conveyed that detection of cancerous tissue prior to morcellation is feasible and likely.

113.    Evidence available to the Defendants, however, showed that the risk of

25

undetected leiomyosarcoma was <u>1 in 140</u> and, therefore, detection of leiomyosarcoma prior to surgery is not feasible or likely.

114.    Thus, Defendants' statement about use of a tissue extraction bag only when cancer is detected and suspected did not and could not eliminate the risk of dissemination of uterine cancer in those cases of hidden cancer.

115.    Defendants' statement, in fact, ensured harm to patients, Plaintiff included, by providing a false and inadequate warning.

116.    Neither the 510(k) submissions, nor Defendants' inadequate warnings concerning their Laparoscopic Power Morcellators, adequately instructed Plaintiff or her surgeon that an appropriate tissue bag to contain shredded tissue fragments should be used to prevent or minimize the risk of disseminating and worsening occult uterine cancer.

117.    Defendants' also failed to adequately warn of the risks associated with their Laparoscopic Power Morcellators including, but not limited to:

a.    The failure to adequately warn because any Warnings  given were not commensurate with the risks involved;

b.    The failure to adequately warn because the Warnings contained no information about the risk of disseminating and upstaging a patient's occult cancer;

c.    The failure to timely include a Black Box Warning regarding the risks of disseminating and upstaging a patient's occult cancer; and

d.    The failure to timely include a Contraindication regarding the risks of disseminating and upstaging a patient's occult or unknown cancer.

118.    Defendants' failure to timely or appropriately warn of the foregoing risks prevented Plaintiff and her surgeon from fully or correctly evaluating the risks and benefits of

undergoing surgery with the Defendants' Laparoscopic Power Morcellators.

119. Because of Defendants failure to adequately warn Plaintiff and her surgeon of the risks associated with Laparoscopic Power Morcellator use and the device's propensity to disseminate and upstage or worsen cancer, Plaintiff was caused severe and permanent injures and increased the likelihood of her death.

**E.** **FDA Action and the "World Wide Withdrawal" of Johnson & Johnson Laparoscopic Power Morcellators in 2014**

120. On April 17, 2014, more than three years after Plaintiff underwent surgery with Defendants' Laparoscopic Power Morcellator, the FDA released a Safety Communication Notice and Quantitative Assessment to inform health care providers and the public that "based on currently available information, *the FDA discourages the use of laparoscopic power morcellation during hysterectomy or myomectomy for the treatment of women with uterine fibroids.*" 4/17/2014 FDA Safety Communication (emphasis added).

121. The FDA further warned the medical community that:

> Importantly, based on an FDA analysis of currently available data, it is estimated that *1 in 350 women undergoing hysterectomy or myomectomy for the treatment of fibroids is found to have an unsuspected uterine sarcoma,* a type of uterine cancer that includes leiomyosarcoma. If laparoscopic power morcellation is performed in women with unsuspected uterine sarcoma, there is a risk that the procedure will spread the cancerous tissue within the abdomen and pelvis, significantly worsening the patient's likelihood of long-term survival.

*Id.* (emphasis added).

122. Significantly, m the FDA's "Quantitative Assessment of the Prevalence of Unsuspected Uterine Sarcoma in Women Undergoing Treatment of Uterine Fibroids," the FDA listed the studies it relied on in reaching its conclusions on the prevalence of unsuspected uterine sarcoma and uterine leiomyosarcoma.

123. The studies cited by the FDA were published in prominent medical journals,

ranging in publication date from 1980 to 2014. Significantly, sixteen (16) of the eighteen (18) studies cited by the FDA in Table I, were available to Defendants prior to the date on which Plaintiff underwent surgery.

124. Shortly after the FDA released its prevalence data, the JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION published the results of Wright et al.'s findings on how many women might have undetected cancer that a Laparoscopic Power Morcellator could unintentionally spread.

125. Wright et al. examined the Perspective Insurance Database, which collects data from over 500 hospitals, to identify women who had a minimally invasive hysterectomy from 2006-2012 with the use of a power morcellator being captured by charge codes.

126. Of the 232,882 women who had minimally invasive surgery during the study period, power morcellation was used in 36,470 surgeries (15.7%).

127. Of these, 99 women were identified as having uterine cancer, for a prevalence of 27/10,000 (95% Cl, 22-32/10,000), a prevalence that was positively correlated with patient age, and translates into a 1 in 368 risk of occult malignancy, in keeping with the FDA's Quantitative Assessment, which found a 1 in 352 risk of unsuspected uterine sarcoma.

128. In July 2014, FDA convened an Advisory Committee ("AdCom") meeting of the Obstetrics and Gynecological Medical Device Advisory Committee on Laparoscopic Power Morcellators to discuss, among other topics, "whether a 'boxed warning' related to the risk of cancer spread should be required for laparoscopic power morcellators." *Id.*

129. In preparation for the AdCom meeting, the FDA prepared an Executive Summary, which detailed the results of the FDA's safety review and stated:

> 1. The risk of having an unsuspected sarcoma in the population of women u.'.1.dergoing hysterectomy or myomectomy for presumed fibroids may be

as high as approximately 1 in 350 for all types of uterine sarcomas, and 1 in 500 for LMS [leiomyosarcoma] specifically.

2.     Peritoneal dissemination and/or cancer upstaging (to FIGO Stage III or IV) following morcellation of an unsuspected sarcoma may occur in approximately 25-65% of cases.

3.     Patients with unsuspected uterine sarcoma who undergo morcellation may be at significantly higher risk for local (pelvic/abdominal) and overall cancer recurrence compared to those who do not undergo morcellation.

4.     Patients with unsuspected sarcoma who undergo morcellation may have poorer disease-free survival and overall survival compared to patients who do not receive morcellation.

*See* Food and Drug Administration Executive Summary, prepared for the July 10-11, 2014 meeting of the Obstetrics and Gynecology Devices Advisory Committee, *Laparoscopic Power Morcellation during Uterine Surgery for Fibroids* ("FDA Executive Summary"), p. 23.

130.     On July 10 and 11, 2014, FDA's Obstetrics and Gynecology Devices Panel of the Medical Devices Advisory Committee convened the AdCom meeting on Laparoscopic Power Morcellators. The two-day meeting consisted of presentations from FDA scientists, FDA invited speakers, Laparoscopic Power Morcellator manufacturers, and members of the public.

131.     Based on the data and literature reviewed, the panel made a number of recommendations on Laparoscopic Power Morcellation labeling, including:

a.     Laparoscopic Power Morcellators should not be used in patients with known or suspected malignancy. *See* FDA Brief Summary of the Obstetrics and Gynecology Devices Panel of the Medical Devices Advisory Committee Meeting -July 10-11, 2014 ("FDA AdCom Summary Panel Findings") p. 3.

b.     A black boxed warning related to the risk of disseminating unsuspected malignancy during surgeries for presumed benign fibroids would be useful *but not enough* to address the issue alone. *Id.* (emphasis added).

29

   c.  The panel also expressed interest in exploring other ways to ensure that patients

have the appropriate information related to the risk, including a mandatory patient

consent form to be signed by the patient and physician. *Id*

  132.  The AdCom panel also found that the patient populations for which the risks of

Laparoscopic Power Morcellation may outweigh the benefits were quite limited, noting that

several panel members identified peri- or post-menopausal women with symptomatic uterine

fibroids. *Id.* at 2-3.

  133.  Facing mounting negative publicity about its devices spreading cancer, on April

30, 2014, the JOHNSON & JOHNSON Defendants suspended worldwide sale of their

Laparoscopic Power Morcellators.

   134.  In a "Dear Healthcare Provider" letter, JOHNSON & JOHNSON explained:

> Based on this Safety Communication, in order to align with the
> FDA's recommendation and Ethicon's internal investigations, Ethicon
> has decided to suspend global commercialization (sales, distribution,
> and promotion) of its Morcellation Devices until the role of
> morcellation for patients with symptomatic fibroid disease is further
> redefined by FDA and the medical community.

  135.  In that same letter, the JOHNSON & JOHNSON Defendants emphasized that

the decision to suspend global commercialization was "not a product removal." *Id.*

  136.  On July 30, 2014, the JOHNSON & JOHNSON Defendants issued an urgent

worldwide withdrawal of the Ethicon Morcellators.

  137.  The JOHNSON & JOHNSON Defendants continued to defend their

Laparoscopic Power Morcellator devices, stating that "Ethicon Morcellation Devices perform as

intended and there are patients who can benefit from procedures using laparoscopic power

morcellators, but the risk-benefit assessment associated with the use of these devices in

hysterectomy and myomectomy procedures for removing fibroids remains uncertain."

138.    On November 24, 2014, the FDA issued and updated FDA Safety Communication regarding Laparoscopic Uterine Power Morcellation in Hysterectomy and Myomectomy.

139.    According to the Safety Communication, the FDA was issuing an Immediately In Effect (IIE) guidance that asked manufacturers of Laparoscopic Power Morcellators to include two contraindications and a boxed warning in their product labeling, which warned the medical community against using laparoscopic power morcellators in the majority of women undergoing myomectomy or hysterectomy, and recommends doctors share this information with their patients.

140.    The boxed warning informs health care providers and patients that:

Uterine tissue may contain unsuspected cancer. The use of laparoscopic power morcellators during fibroid surgery may spread cancer and decrease the long-term survival of patients. This information should be shared with patients when considering surgery with the use of these devices.

141.    The two contraindications advise of the following:

Laparoscopic power morcellators are contraindicated (should not be used) for removal of uterine tissue containing suspected fibroids in patients who are: peri- or post-menopausal, or candidates for *en bloc* tissue removal (removing tissue intact) through the vagina or minilaparotomy incision. (These groups of women represent the majority of women with fibroids who undergo hysterectomy and myomectomy.)

Laparoscopic power morcellators are contraindicated (should not be used) in gynecologic surgery in which the tissue to be morcellated is known or suspected to be cancerous.

## FIRST CAUSE OF ACTION
### NEGLIGENCE

142.    Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

143.    Defendants were regularly engaged in the business of designing, researching,

developing, testing, manufacturing, packaging, labeling, marketing, promoting, distributing and/or selling medical devices known as Laparoscopic Power Morcellators, including the Gynecare Morcellex Tissue Morcellator, for use in gynecological surgery to remove the uterus (hysterectomy) and/or to remove uterine fibroids (myomectomy) in women.

144.   Defendants owed a duty to design, research, develop, test, manufacture, package, label, market, promote, distribute, sell and/or supply products, including gynecologic products used for uterine morcellation, in such a way as to avoid harm to persons upon whom they were used by adequately warning of the hazards and dangers associated with the use of said products.

145.   Defendants, acting by and through their authorized divisions, subsidiaries, agents, servants, and employees, were careless, reckless, negligent, grossly negligent and exhibited willful, wanton, outrageous and reckless disregard for human life and safety in manufacturing, designing, labeling, marketing, distributing, supplying and/or selling, and/or placing into the stream of commerce, gynecologic products, including Laparoscopic Power Morcellators used for uterine morcellation, by:

a.   failing to design their Laparoscopic Power Morcellators for safe use in fibroid removal surgery;

b.   failing to conduct adequate and appropriate testing of their gynecologic products;

c.   marketing their Laparoscopic Power Morcellators without first conducting adequate research to determine possible side effects on humans or selectively and misleadingly revealing or analyzing testing and research data;

d.   failing to monitor registry data regarding their marketed devices and promptly

report any safety concerns that arise through registry study or data;

e.    failing to keeping abreast of scientific literature and studies which provided Defendants notice of the risks associated with the use of Laparoscopic Power Morcellators;

f.    failing to appropriately respond to their own and others testing of, and information available regarding Laparoscopic Power Morcellators, which indicated such products' potential harm to humans;

g.    failing to appropriately monitor the post-market performance, adverse events, and complications reported about their Laparoscopic Power Morcellators and their products' effects on patients;

h.    failing to promptly disseminate new safety information and data regarding their products after their Laparoscopic Power Morcellators reached the market;

i.    failing to adequately warn of the actual potential of their Laparoscopic Power Morcellators to be harmful to humans;

j.    failing to adequately warn of the actual potential for the dissemination and/or upstaging of metastases of cancer when using Laparoscopic Power Morcellators for uterine morcellation;

k.    concealing their full knowledge and experience regarding the potential that Laparoscopic Power Morcellators were harmful to humans because there was a substantial risk their products would spread cancer;

l.    failing to adequately define the patients populations, if any, for which Laparoscopic Power Morcellator could be safely used;

m.    promoting, marketing, advertising and/or selling their Laparoscopic Power

Morcellators for use for uterine morcellation given their knowledge and experience of such products' potential harmful effects;

n.    failing to timely withdraw products used for uterine morcellation from the market, restrict their uses and adequately warn of such products' potential dangers, given their knowledge of the potential for its harm to humans;

o.    failing to fulfill the standard of care required of a reasonably prudent medical device manufacturer;

p.    disregarding publicity, government and/or industry studies, information, documentation and recommendations, consumer complaints and reports and/or other information regarding the hazards of uterine morcellation and its potential harm to humans;

q.    failing to provide updated information in the form of reports, statistics and outcomes of studies to physicians, hospitals and other healthcare entities

r.    concerning the increased likelihood of cancer dissemination when such data became available;

s.    promoting the products used for uterine morcellation on websites aimed at creating user and consumer demand;

t.    advertising and promoting their products used for uterine morcellation as safe and/or safer than other methods of uterine fibroid removal; and

u.    such other acts or omissions constituting negligence and carelessness as may appear during the course of discovery or at the trial of this case.

146.    Despite the fact that Defendants knew or should have known that their Laparoscopic Power Morcellators were associated with and/or caused the dissemination and/or

upstaging of unsuspected malignant tissue, Defendants continued to market, manufacture, distribute, and/or make available their Laparoscopic Power Morcellators to patients through their surgeons and/or health care facilities, including the Plaintiff and her surgeon.

147.    Defendants, directly or through their sales staff and/or agents, paid consultants, and/or licensed distributors, among others, made false material representations and/or material omissions through the course of aggressive sales and marketing operations that implemented false and misleading statements by sales representatives, Defendant-sponsored literature, Defendant-sponsored events and conferences, online and/or video marketing, or other promotional material in order to promote and sell their Laparoscopic Power Morcellators while omitting material facts regarding said devices' dangerous side effects and adverse events.

148.    Defendants knew or should have known that consumers, such as the Plaintiff, would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

149.    Defendants' negligence (and/or recklessness) was the cause of and substantial factor in bringing about Plaintiff's injuries, harm and economic loss.

150.    Defendants' acted in conscious disregard of, or indifference to, the high degree of risk of physical harm to women undergoing surgery with their Laparoscopic Power Morcellators, including Plaintiff herein, of which Defendants knew or has reason to know, giving rise to punitive damages.

151.    Defendants knew or should have known of the danger associated with the use of their Laparoscopic Power Morcellator as well as the defective nature of said products, but continued to design, manufacture, sell, distribute, market, promote and/or supply their Laparoscopic Power Morcellators so as to maximize sales and profits at the expense of the public

health and safety.

152.     Defendants are doing business in Florida.

153.     Defendants carried on solicitation or service actives in Florida.

154.     The Defendants' Laparoscopic Power Morcellators were used within Florida in the ordinary course of trade.

155.     Defendants derived and derive substantial revenue from interstate commerce.

156.     As a result of Defendants' negligence and/or recklessness, Plaintiff was caused to suffer serious and dangerous side effects including the dissemination and/or upstaging of unsuspected malignant tissue increasing the likelihood of her death, physical pain and mental anguish, diminished enjoyment of life, any and all life complications caused by Plaintiff's cancer.

157.     By reason of the foregoing, Plaintiffs demand judgment against each Defendant, individually, jointly and severally for compensatory damages in a sum that exceeds the jurisdictional limits of all lower courts that might otherwise have jurisdiction, and punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief as the Court deem proper.

## SECOND CAUSE OF ACTION
## STRICT PRODUCT LIABILITY (DEFECTIVE DESIGN)

158.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

159.     Defendants' Laparoscopic Power Morcellators, including the Gynecare Morcellex Tissue Morcellator, were expected to, and did, reach the intended consumers, handlers, and persons coming into contact with the product without substantial change in the condition in which they were designed, produced, manufactured, labeled, sold, distributed,

and/or marketed by Defendants.

160.   Defendants' Laparoscopic Power Morcellators, including the Gynecare Morcellex Tissue Morcellator, were defective in design or formulation in that they were not reasonably fit, suitable or safe for their intended purpose and/or their foreseeable risks exceed the benefits associated with their design.

161.   Defendants' Laparoscopic Power Morcellators were defective in design or formulation in that they lacked efficacy, posed a greater likelihood of injury and were more dangerous than other available surgical treatment options indicated for the same conditions and uses, including those discussed above.

162.   Defendants' Power Morcellators were defective in design or formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design, including those discussed above, which had more established safety profiles and a considerably lower risks, or by the provision of reasonable instructions or warnings.

163.   Defendants' Laparoscopic Power Morcellators, as designed, posed a substantial and avoidable likelihood of harm and it was feasible to design said products in a safer manner.

164.   Defendants' Laparoscopic Power Morcellators, including the Gynecare Morcellex Tissue Morcellator, were defective in design or formulation in that the dangers associated with their use were unknowable and unacceptable to the average or ordinary consumer.

165.   Defendants' Laparoscopic Power Morcellators failed to comply with state and federal standards when sold.

166.   At the time of Plaintiff's surgery, the Laparoscopic Power Morcellator was being

used for its advertised and intended purpose, and in the manner Defendants intended.

167.     As a foreseeable, direct, and proximate result of the aforementioned wrongful acts and omissions of Defendants, Plaintiff was caused to suffer from the aforementioned injuries and damages.

168.     Due to the aforesaid condition of the Laparoscopic Power Morcellator used on Plaintiff during her surgery, Defendants are strictly liable to Plaintiff.

169.     By reason of the foregoing, Plaintiffs demand judgment against each Defendant, individually, jointly and severally for compensatory damages in a sum that exceeds the jurisdictional limits of all lower courts that might otherwise have jurisdiction, and punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief as the Court deem proper.

## THIRD CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY (FAILURE TO WARN)

170.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

171.     Defendants were under an ongoing duty to keep abreast of medically known or knowable information related to their products and to advise clinicians of these risks in a timely manner to ensure the safe use of their product.

172.     Defendants failed to adequately warn health care professionals and the public, including Plaintiff and her surgeon, of the following risks associated with the use of their Laparoscopic Power Morcellators, all of which were known or scientifically knowable to Defendants prior to the date on which the Plaintiff underwent surgery in 2010, including, but not limited to:

a.   the risk of aggressively disseminating unsuspected malignant tissue beyond the uterus;

b.   the device's risk of upstaging a patient's undetected or occult cancer;

c.   failing to provide accurate warnings regarding the inadequacy of pre-operative screening for the presence of unsuspected malignant uterine tissue in women;

d.   failing to provide accurate rates of the prevalence of unsuspected malignant tissue in women undergoing uterine morcellation; and

e.   failing to advise doctors to carefully monitor patients following Laparoscopic Power Morcellator surgery to evaluate for the presence of uterine cancer at an earlier date and to allow for appropriate treatment in the event of such a finding.

173.   Defendants' failure to adequately warn Plaintiff and her surgeon of the risks associated with Laparoscopic Power Morcellators prevented Plaintiff and her surgeon from correctly and fully evaluating the risks and benefits of undergoing surgery with the Defendants' device.

174.   Defendants also have known or should have known of the risks associated with the use of specimen containment bags that were not designed for use with a Laparoscopic Power Morcellator, including their potential to perforate or tear during laparoscopic surgery, thereby, creating a risk of tumor spillage and site seeding. *See e.g.* Cai, et al., Electrical Prostate Morcellator: An Alternative to Manual Morcellation for Laparoscopic Nephrectomy Specimens? An In Vitro Study, ADULT UROLOGY, 61(6):1113-17, 1113 (2003) (finding a 90% perforation rate with mechanical morcellation without direct visualization).

175.   Defendants failed to timely include a Black Box Warning regarding the risks of dissemination of occult malignancy and the upstaging of a patient's occult cancer.

176.     Defendants failed to timely include a Contraindication that Power Morcellators should not be used in women with tissue of unsuspected, occult, or unknown malignancy.

177.     Had Defendants timely and adequately warned of the risks of the Laparoscopic Power Morcellator used during Plaintiff's surgery, such warnings would have been heeded by Plaintiff's surgeon, in that Plaintiff's surgeon  would  have changed the manner in which he prescribed or selected the Power Morcellator for Plaintiff's surgery, including but not limited to, communicating the risks to the Plaintiff prior to surgery, not using the Power Morcellator, and/or selecting an alternative and safer treatment option for Plaintiff.

178.     If Plaintiff had been adequately warned of the life-threatening risks of the use of the Laparoscopic Power Morcellator, as stated herein, she would have chosen an alternative treatment, one that did not carry the avoidable risks of disseminating and/or upstaging occult cancer and, therefore, would have avoided the injuries described herein.

179.     Defendants' failure to adequately warn about the risk of their Power Morcellators was a substantial and contributing factor in causing Plaintiff's injuries.

180.     As a foreseeable, direct, and proximate result of the aforementioned wrongful acts and omissions of Defendants, Plaintiff was caused to suffer from the aforementioned injuries and damages.

181.     By reason of the foregoing, Plaintiffs demand judgment against each Defendant, individually, jointly and severally for compensatory damages in a sum that exceeds the jurisdictional limits of all lower courts that might otherwise have jurisdiction, and punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief as the Court deem proper.

## FOURTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTIES

40

182.    Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

183.    Defendants expressly warranted through their labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that their Laparoscopic Power Morcellators, including the Gynecare Morcellex Tissue Morcellator, were safe, and withheld and concealed information from Plaintiff and her surgeon about the substantial risks of serious injury and/or death associated with using the products used for uterine morcellation.

184.    Defendants expressly warranted that their Laparoscopic Power Morcellators were safe for their intended use and as otherwise described in this complaint.

185.    The Laparoscopic Power Morcellator used on Plaintiff during her surgery did not conform to these express representations, including, but not limited to, the representation that it was well accepted in patient studies, the representation that it was safe for use, the representation that it did not have high and/or unacceptable levels of life-threatening side effects, and that it would improve or maintain health, and potentially prolong life.

186.    Defendants represented that the products used for uterine morcellation were safer and more efficacious than other alternative surgical approaches and techniques.

187.    Defendants further concealed information, regarding the true efficacy of said products.

188.    Defendants' Laparoscopic Power Morcellators failed to conform to the foregoing express representations because their devices were not safe or effective, could produce serious side effects, including among other things disseminating cancerous tissue beyond the uterus and/or upstaging or worsening cancer, degrading Plaintiff's health, and shrinking her life

expectancy.

189.     Defendants made these material representations, which also included omissions of material fact, to the medical and healthcare community at large, the general public, to Plaintiff's medical or healthcare provider(s), and/or to Plaintiff with intent to induce medical and healthcare providers and patients to dispense, provide, prescribe, accept, and/or purchase their Laparoscopic Power Morcellators.

190.     Defendants made false material representations and/or material omissions through the course of an aggressive sales and marketing operation that implemented false and misleading statements by sales representatives, Defendant-sponsored literature, and/or Defendant-sponsored promotional functions in order to promote and sell their Laparoscopic Power Morcellators while omitting material facts regarding said devices' dangerous side effects and adverse events.

191.     The express warranties represented by the Defendants were a part of the basis for Plaintiff and her surgeon's consent to permit the use of the Laparoscopic Power Morcellator on Plaintiff during her November 17, 2010 surgery.

192.     Plaintiff and her surgeon relied on said express warranties in deciding to use the Laparoscopic Power Morcellator as a treatment option.

193.     At the time of the making of the express warranties, the Defendants had knowledge of the purpose for which their Laparoscopic Power Morcellators were to be used, and expressly warranted the same to be in all respects safe, effective and proper for such purpose.

194.     As a result of the foregoing breach of express warranty, Plaintiff was caused to suffer serious and dangerous side effects including dissemination and worsening of cancer increasing the likelihood of her death, physical pain and mental anguish, including diminished

enjoyment of life, any and all life complications caused by Plaintiff's injuries.

195.    By reason of the foregoing, Plaintiff has been severely and permanently injured.

196.    By reason of the foregoing, Plaintiffs demands judgment against each Defendant, individually, jointly and severally for compensatory damages in a sum that exceeds the jurisdictional limits of all lower courts that might otherwise have jurisdiction, and punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief as the Court deem proper.

## FIFTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY FOR A PARTICULAR PURPOSE

197.    Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

198.    The Defendants impliedly represented and warranted to the users of their Laparoscopic Power Morcellators and patients undergoing surgery with their Laparoscopic Power Morcellators that said devices was safe and fit for the particular purpose for which said products were to be used, namely for the safe removal of uterine tissue and uterine fibroids.

199.    These aforementioned representations and warranties were false, misleading, and inaccurate in that Defendants' Laparoscopic Power Morcellators were unsafe, degraded Plaintiff's health and shortened her life expectancy.

200.    Plaintiff relied on the implied warranty of fitness for a particular use and purpose.

201.    Plaintiff and her surgeon reasonably relied upon the skill and judgment of Defendants as to whether the Defendants' Laparoscopic Power Morcellator was safe and fit for its intended use (hysterectomies and myomectomies, among other indications).

202.    Defendants' Laparoscopic Power Morcellators were placed into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition and the products and materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

203.    Defendants breached the aforesaid implied warranty, as their Laparoscopic Power Morcellators, including the Gynecare Morcellex Tissue Morcellator used on Plaintiff, were not reasonably fit for their intended purposes and uses.

204.    As a result of the foregoing breach of implied warranty, Plaintiff was caused to suffer serious and dangerous side effects including dissemination and worsening of cancer increasing her likelihood of death, physical pain and mental anguish, including diminished enjoyment of life.

205.    By reason of the foregoing, Plaintiffs demands judgment against each Defendant, individually, jointly and severally for compensatory damages in a sum that exceeds the jurisdictional limits of all lower courts that might otherwise have jurisdiction and punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief as the Court deem proper.

## SIXTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

206.    Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

207.    Defendants manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold their Laparoscopic Power Morcellators for the purpose of removing uterine tissue.

208.    Defendants knew and promoted the use of their Laparoscopic Power Morcellators for the use for which said device was to be used on the Plaintiff, namely treating uterine fibroids, improving health, maintaining health, and potentially prolonging life.

209.    Defendants impliedly warranted to Plaintiff and her surgeon that their Laparoscopic Power Morcellators were of merchantable quality for the purposes for which they were to be used.

210.    These aforementioned representations and warranties were false, misleading, and inaccurate in that the Power Morcellator used on Plaintiff was unsafe, degraded Plaintiff's health and shortened her life expectancy.

211.    Plaintiff and her surgeon reasonably relied on the skill, expertise and judgment of the Defendants and their representations as to the fact that the Laparoscopic Power Morcellator selected for and used on Plaintiff was of merchantable quality.

212.    Said Laparoscopic Power Morcellators were not of merchantable quality, in that said devices had dangerous and life threatening side effects and; thus, were not fit for the ordinary purpose for which they was intended.

213.    As a direct and proximate result of the foregoing, Plaintiff was caused bodily injury increasing the likelihood of her death, pain and suffering, and economic loss.

214.    By reason of the foregoing, Plaintiffs demand judgment against each Defendant, individually, jointly and severally for compensatory damages in a sum that exceeds the jurisdictional limits of all lower courts that might otherwise have jurisdiction, and punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief as the Court deem proper.

## SEVENTH CAUSE OF ACTION
## FRAUDULENT  MISREPRESENTATION AND OMISSION

215.    Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

216.    Defendant, having undertaken design, formulation, testing, manufacture, marketing, sale, and distribution of devices used for uterine morcellation, including the MORCELEX morcellator owed a duty to provide accurate and complete information regarding said devices.

217.    Prior to Plaintiff undergoing her surgery defendants fraudulently misrepresented, that the use of their MORCELEX morcellator for uterine morcellation was safe and effective.

218.    Defendant had a duty to provide Plaintiff, physicians, and other consumers with true and accurate information regarding the devices for uterine morcellation it manufactured, marketed, distributed and sold.

219.    Defendant made representations and failed to disclose material facts with the intent to induce consumers, including Plaintiff and the medical community to act in reliance by purchasing and using the MORCELEX uterine morcellator sold by defendant.

220.    Plaintiff and the medical community justifiably relied on Defendant's representations and omissions by purchasing and using the uterine morcellator during Plaintiff s surgery.

221.    Defendant's representations and omissions regarding use of its uterine morcellation devices were a direct and proximate cause of Plaintiff's injuries.

222.    By reason of the foregoing, Plaintiffs demand judgment against each Defendant, individually, jointly and severally for compensatory damages in a sum that exceeds the jurisdictional limits of all lower courts that might otherwise have jurisdiction, and punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief

as the Court deem proper.

## EIGHTH CAUSE OF ACTION
## LOSS OF CONSORTIUM

223.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

224.     At all times relevant to this action, Plaintiff Evanthia Kotis was the mother and sole caregiver and caretaker for minor-Plaintiff AK, who is presently twelve (12) years old, unmarried, and entirely and solely dependent on Plaintiff.

225.     Due to the negligence of Defendants as described *supra*, parent-Plaintiff has suffered significant permanent injury resulting in her permanent total disability and, in all likelihood, death.

226.     Pursuant to Section 768.0415 of the Florida Statutes, Defendants are liable to minor-Plaintiff for damages, including damages for permanent loss of services, comfort, companionship, and society.

227.     By reason of the foregoing, Plaintiffs demand judgment against each Defendant, individually, jointly and severally for compensatory damages in a sum that exceeds the jurisdictional limits of all lower courts that might otherwise have jurisdiction, and punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief as the Court deem proper.

## PRAYER FOR PUNITIVE DAMAGES

228.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

229.     At all times material hereto, Defendants knew or should have known that the use

47

of laparoscopic power morcellators, and specifically the Ethicon Gynecare Morcellex Tissue Morcellator, was dangerous with respect to the risk of spreading and disseminating cancerous cells and tissue.

230. At all times material hereto, Defendants attempted to misrepresent and did misrepresent facts concerning the safety of laparoscopic power morcellators, and specifically the Ethicon Gynecare Morcellex Tissue Morcellator.

231. Defendants' misrepresentations included knowingly withholding material information from the medical community and the public, including Plaintiff, concerning the safety of the subject product. Defendant's conduct was malicious, willful, wanton, or oppressive and shows a reckless indifference to the interests of others.

232. At all times material hereto, Defendants knew and recklessly disregarded the fact that laparoscopic power morcellators, and specifically the Ethicon Gynecare Morcellex Tissue Morcellator, could cause the spreading and dissemination of cancer cells and tissue throughout the body.

233. Notwithstanding the foregoing, Defendants continued to aggressively market the subject product to doctors, including Plaintiff's surgeon, without disclosing the aforesaid dangers.

234. Defendants knew of the subject product's lack of warnings regarding the risk of disseminating undiagnosed cancers and upstaging the cancer, but they intentionally concealed and/or recklessly failed to disclose that risk and continued to market, distribute, and/or sell laparoscopic power morcellators, and specifically the Ethicon Gynecare Morcellex Tissue Morcellator, without said warnings so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff herein, in conscious and/or negligent disregard

of the foreseeable harm caused by laparoscopic power morcellators, and specifically the Ethicon Gynecare Morcellex Tissue Morcellator.

235.    Defendants' intentional and/or reckless failure to disclose information deprived Plaintiff and her surgeon of necessary information to enable them to weigh the true risks of using a laparoscopic power morcellator, and specifically the Ethicon Gynecare Morcellex Tissue Morcellator, during her November 2010 surgery.

236.    As a direct and proximate result of the foregoing, Plaintiff was caused bodily injury increasing the likelihood of her death, pain and suffering, and economic loss.

237.    Defendants' aforesaid conduct was committed with knowing, malicious, willful, wanton, oppressive, reckless, careless and deliberate disregard for the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.

238.    By reason of the foregoing, Plaintiffs demand judgment against each Defendant, individually, jointly and severally for punitive damages, together with compensatory damages, interest, costs of suit, attorneys' fees and all such other and further relief as the Court deem proper.

### PRAYER FOR ALL RELIEF AVAILABLE UNDER THE LAW

**WHEREFORE**, Plaintiffs pray for relief and judgment against Defendants as follows:

(a)    For general compensatory damages and special damages in a sum in excess of the jurisdictional minimum of this Court;

(b)    For medical, incidental, and hospital expenses according to proof;

(c)    For pre-judgment and post-judgment interest as provided by law;

(d)    For consequential damages in excess of the jurisdictional minimum of this Court;

(g)     For punitive damages in an amount in excess of any jurisdictional minimum of this Court and in an amount sufficient to impress upon Defendants the seriousness of their conduct and to deter similar conduct in the future;

(h)     For loss of consortium damages to minor-Plaintiff for the permanent loss of services, comfort, companionship, and society of her mother;

(i)     For attorneys' fees, treble damages, expenses, and costs of this action; and

(j)     For such further relief as this Court deems necessary, just, and proper.


### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all counts and as to all issues.


Dated: March 17, 2015

Respectfully submitted,

**POGUST BRASLOW & MILLROOD, LLC**

Kevin O'Brien, Esq. (FL Bar ID # 56621)
Andrew J. Sciolla, Esq. (to submit *pro hac vice* application)
Harris L. Pogust, Esq. (to submit *pro hac vice* application)
Eight Tower Bridge, Suite 1520
161 Washington Street
Conshohocken, PA 19428
*Telephone:* (610) 941-4305
*Facsimile:* (610) 941-4245
kobrien@pbmattorneys.com
asciolla@pbmattorneys.com
hpogust@pbmattorneys.com